Exhibit 2 part 2

```
 1        Q.    So, you requested to go from hourly to
 2   flat rate?
 3        A.    Yes, I did.
 4        Q.    Was there a diary kept when you were at
 5   Houser Buick of all the jobs that you did?
 6        A.    Yes, there is.
 7        Q.    Did everyone keep did a diary like that?
 8        A.    All the people that worked flat rate.
 9        Q.    Did you review that at the end of every
10   week?
11        A.    Yes, I did.
12        Q.    Did you review it with Mr. O'Connor?
13        A.    That's how we did payroll.
14        Q.    Was it required by Mr. O'Connor that you
15   keep this diary book?
16        A.    Yes.
17        Q.    Correct?
18        A.    Yes.
19        Q.    And the documents would be stapled into
20   the diary, correct?
21        A.    What documents are we talking about?
22        Q.    Well, describe for me the diary.
23        A.    The diary consists of all the jobs you
24   did, the work order number from the insurance papers.
```

```
 1    When you did payroll, we went over all the jobs we
 2    did.  The only thing you would staple to it was your
 3    time card.
 4         Q.   So, the time card was the only thing
 5    stapled to it?
 6         A.   Yes.
 7         Q.   You went over that every single week with
 8    Mr. O'Connor?
 9         A.   Yes.
10         Q.   Is it your contention in this lawsuit
11    that you weren't paid properly?
12         A.   That's correct.
13         Q.   When is the first week that you weren't
14    paid properly?
15         A.   Probably the first week I went on flat
16    rate.
17         Q.   That was about, if you can refer to
18    Exhibit 1, you see Exhibit 1?
19         A.   Yup.
20         Q.   Tell me the first week that you believe
21    you weren't paid properly.
22         A.   It had to be the first week I started.
23         Q.   With reference to Exhibit 1, can you --
24         A.   11/5/99.
```

1   Q. Going back to November, '99, you weren't
2   paid properly, correct?
3   A. That's correct.
4   Q. You met every single week with
5   Mr. O'Connor and this diary, correct?
6   A. Yes, I did.
7   Q. When did you first understand that or
8   realize that you were not being paid properly?
9   A. When I realized the first week, I
10  commented to Mr. O'Connor the difference I saw in the
11  insurance estimate and the way I was getting paid.
12  And he answered that I wasn't doing everything
13  properly.
14  Q. In November, 1999, you realized that you
15  were not being paid properly, right?
16  A. That is correct.
17  Q. You met every single week with,
18  Mr. O'Connor until March of 2003, correct?
19  A. Yes, I did.
20  Q. So, your contention is that every single
21  week you were paid incorrectly?
22  A. Just about, yes. We would go over that
23  every Friday.
24  Q. Yet you continued working there all those

```
 1   years, correct?
 2       A.   Yes, I did.
 3       Q.   Did you ever go see Mr. Houser about not
 4   being paid properly?
 5       A.   No, I did not.
 6       Q.   But every single Friday you and
 7   Mr. O'Connor would sit down with this diary and the
 8   time card and go over how much you were to be paid,
 9   correct?
10       A.   That's correct.
11       Q.   You're saying that every single week, he
12   basically sat there and cheated you?
13       A.   That is correct.
14       Q.   You worked there for four years, when did
15   you first go see a lawyer?
16       A.   The week I quit, the week after.
17       Q.   Who did you go see?
18       A.   I saw my lawyer, Steven Weiner.
19       Q.   How did you get to Mr. Weiner?
20       A.   He has been my family lawyer for years.
21       Q.   What other things has he done for you?
22       A.   Nothing.
23       Q.   He has been your lawyer, what other sort
24   of legal things has he done?
```

1  realistic for both the insurer and for the employees,
2  do you see that?
3       A.   Yes, I do.
4       Q.   You say you and other hispanic automobile
5  technicians were forced to work from estimates that
6  cheated us out of time spent.  Do you see that?
7       A.   Yes, I do.
8       Q.   You used the term other hispanic
9  automobile technicians there, okay.  Do you see that
10 in Exhibit 2, third paragraph under Exhibit A?
11      A.   Yes.
12      Q.   What other hispanic automobile
13 technicians are you referring to?
14      A.   There was only one other one.
15      Q.   What's that?
16      A.   There was only one more body technician
17 there.
18      Q.   Okay.  Who?
19      A.   His name was George.  I can't remember
20 his name.  He wasn't on flat rate, though.  He was
21 hourly.
22      Q.   I'm going to read this sentence to you
23 from Exhibit A on Exhibit 2.  It says, both myself
24 and other hispanic automobile technicians were forced

1   to work from estimates that cheated us out of time
2   spent.  Did I read that properly?
3       A.   Yes, you did.
4       Q.   That's a sentence that you swore to the
5   truth of, correct?
6       A.   Yup, that's correct.
7       Q.   The phrase, I'd like to you focus on the
8   phrase other hispanic automobile technicians, do you
9   see that?
10      A.   Yes, I do.
11      Q.   Whom are you referring to?
12      A.   Talking about George.  I don't know his
13  last name.  He --
14      Q.   I'm sorry.  George.  That's one other
15  hispanic automobile technician.  Is there anybody
16  else?
17      A.   There was no other technician there, just
18  myself and him.
19      Q.   You say George was on an hourly basis?
20      A.   Yes, he was.
21      Q.   He was an hourly employee, okay.  How was
22  George cheated by Houser Buick?
23      A.   He was underpaid.
24      Q.   How was he underpaid if he worked on an

1  hourly basis?
2     A.   He should have been making more money an
3  hour than he really was.
4     Q.   Meaning if he was being paid 12.50 an
5  hour, he was really worth 13 or 14 or $15 an hour?
6     A.   Yeah, I would say that.
7     Q.   How is it related to his national origin?
8     A.   Well, I'm sure if it was another white, a
9  male white male working there, he would probably get
10 paid more.
11    Q.   What do you base that upon?
12    A.   Experience.
13    Q.   What facts do you have to support your
14 allegation here that George, another hispanic
15 employee, did not receive the hourly rate that he
16 deserved because of his national origin?
17    A.   The only proof I have of that is George
18 himself.
19    Q.   I'm asking you for the factual basis of
20 your statement.
21    A.   Actual facts?  Well, while I worked
22 there, he came and complained to me.
23    Q.   He complained he wasn't making enough
24 money?

1    A.    That's right.
2    Q.    Have you ever been at a job where a
3 co-worker complained they weren't making enough
4 money?
5    A.    Yes.
6    Q.    Does that happen pretty often?
7    A.    Not that often, but yes.
8    Q.    In the last paragraph of Exhibit A on
9 Exhibit 2 you say that Kevin O'Connor called you
10 names and you say, quote racial epithets. Do you see
11 that?
12   A.    Yes, I do.
13   Q.    Tell me all the racial epithets that
14 Mr. O'Connor used.
15   A.    First of all, he used to say I'm a white
16 man trapped in a Puerto Rican's body and said that
17 pretty frequent. He would also call me a bum off the
18 street. He'd tell me I was an alcoholic, that I
19 never spend time with my children. And on occasions,
20 he would ask me where is my carriage.
21   Q.    What did you understand that, where is my
22 carriage, to be?
23   A.    He meant where my carriage, calling me a
24 bum, and you know how bums push the shopping carts to

```
 1    through the years.  I went over the document of
 2    supposedly all the absentees that I've had which are
 3    not true.  Everything should be in the file.  I went
 4    over mostly my own file.  I wanted to make sure that
 5    I wasn't going to go in here and lie to you.
 6         Q.    I would like you to tell me each and
 7    every visitor to a white employee that was treated
 8    better than your visitors.
 9         A.    Most of the time, it was their family
10    members and good friends.  There's one of Wayne
11    Barnes' friends who owned a yellow Mustang, that guy
12    could come in and get whatever done on his car with
13    no problem.  Mr. O'Connor never approached none of
14    the white employee's friends that came in and ever
15    said anything to them along the lines of, you have to
16    leave, empty your pockets, nothing like that.
17         Q.    I'd like you to tell me what visitor to a
18    white employee was treated better than visitors to
19    you and giving me the approximate date and substance
20    of the visit.
21         A.    I don't know names.  The dates, I
22    couldn't really tell you that.  I didn't keep track
23    of anything like that.  I thought Mr. O'Connor would
24    handle situations like that, seeing what happened to
```

```
1    my visitors, but he never did.  I have no names.
2         Q.   Any dates?
3         A.   No dates.
4         Q.   Do you see in Exhibit 3, count two, Roman
5    numeral two, paragraph 16, do you see that?
6         A.   Yes, I do.
7         Q.   Do you believe there is some
8    accommodation that Houser Buick should have made to
9    you?
10        A.   To me?
11        Q.   Yes.
12        A.   Could you rephrase the word
13   accommodating?
14        Q.   Let me ask it this way:  In paragraph 16,
15   it says that the Defendant's acts violated
16   Massachusetts General Laws Chapter 151B in
17   accommodating and in treating equally the Plaintiff.
18   Did I read that correctly?
19        A.   Yes, you did.
20        Q.   I believe we've been talking about
21   treating equally, but now I want to focus on the
22   words accommodating.  Do you see that word there?
23        A.   Yes, I do.
24        Q.   What do you mean by that?
```

1    back to Mr. Barnes and told him to stop painting cars
2    in an inept fashion. Do you see that?
3        A.    That is correct.
4        Q.    When is the last time you heard
5    Mr. O'Connor yell at or berate a hispanic employee
6    who was a buffer instead of bringing the job back to
7    Mr. Barnes?
8        A.    That happened about 90 percent of the
9    time. When?
10       Q.    Okay.
11       A.    When? I can't give you no dates.
12       Q.    Can you give me one specific date,
13   approximate date when that happened?
14       A.    Approximate date?
15       Q.    Yes.
16       A.    I cannot do that.
17       Q.    Can you give me a specific incident
18   involving a specific hispanic employee who was a
19   buffer and the approximate time of the incident?
20       A.    I can only tell you about the incident.
21   I can't tell you the date and time.
22       Q.    Tell me about at least one specific
23   incident.
24       A.    Well, Mark Barnes would come to work hung

1   over and he would paint cars and drip the clear and
2   they would send the cars just like that to the
3   reconditioners.  Reconditioners would try to fix it.
4   Since the run was so big, they would burn it and get
5   yelled at for burning the paint when it should have
6   been sent back to the painter.
7       Q.   Can you give me one specific incident
8   involving the hispanic buffer who you believe got
9   yelled at unjustly?
10      A.   No, I cannot.  It happened so often, I
11  cannot give you one specific.
12      Q.   In the paragraph that starts with, Fifth,
13  the difference between myself and Wayne Barnes.  Do
14  you see that on Exhibit 4?
15      A.   Yes.
16      Q.   You talked about Mr. Barnes intimidating
17  you by speaking to you in an assaultive manner.  Do
18  you see that?
19      A.   Yes.
20      Q.   You talk about him putting his finger in
21  your face and yelling at you, is that correct?
22      A.   Yes.
23      Q.   You've already told me about one
24  incident.  Was it one incident or more than one

1  incident?
2      A.   Just that once when he put his finger in
3  my face.
4      Q.   Can you tell me again approximately when
5  that happened?
6      A.   I cannot.  I don't have an exact date.
7  There is a witness to the fact, though.
8      Q.   To the disagreement, that's Jeremy?
9      A.   To him pointing his finger at me, yes,
10 and Mr. O'Connor was there.
11          MR. SIKORSKI:  Off the record?
12              (A recess was taken)
13              (Exhibit 5, marked)
14              (Exhibit 6, marked)
15     Q.   (By Mr. Sikorski)  Mr. Quinones, can you
16 review Exhibit 5 and Exhibit 6?
17          MR. WEINER:  Number five is 15007.
18          MR. SIKORSKI:  Yes.
19          MR. WEINER:  Six is 16467.  Thank
20 you.  Go ahead.
21     Q.   (By Mr. Sikorski)  Do you have the
22 estimates for these two jobs that go along with these
23 jobs?
24     A.   Houser Buick has them.  I have the

```
 1    originals.
 2         Q.    Do you have copies of any estimates?
 3         A.    Of the original ones?
 4         Q.    Yes.
 5         A.    No.  This is the work that they gave me
 6    for every job.  This is what you get.
 7         Q.    So --
 8         A.    The originals, they keep.
 9         Q.    My question is:  Do you have any copies
10    of estimates?
11         A.    Besides these?
12         Q.    Yes, okay.  Let's back up.  This is a
13    document called a work order, right?
14         A.    Yes.
15         Q.    Exhibit 5 and Exhibit 6 are work orders,
16    right?
17         A.    Yes.
18         Q.    There's another document called an
19    estimate, correct?
20         A.    Yes, that's correct.
21         Q.    Are those multi-colored forms, one copy
22    goes to the office, one goes stays whatever?
23         A.    No.  They're all white.
24         Q.    They're all white?
```

1    A.    Yes.
2    Q.    Do you have any of those documents or
3  copies of those documents?
4    A.    No, I do not.  That's what that is
5  supposed to be a copy of, but it's not even close to
6  the original estimate.
7    Q.    What you are saying is the work order
8  should dovetail closely with the estimate, correct?
9    A.    That's correct.
10   Q.    Sometimes it does, sometimes it doesn't,
11 correct?
12   A.    It should always be the same.
13   Q.    That's your view, the work order and the
14 estimate should be the same?
15   A.    Yeah.
16   Q.    Again, on Exhibit 4 on the first page,
17 answer to interrogatory number 2, answer to
18 interrogatory number 2, correct, do you see that?
19   A.    Yes, I do.
20   Q.    You say that you're attaching the
21 estimates numbered 15007 and estimate 16467, do you
22 see that?
23   A.    Yes, I do.
24   Q.    What you're actually attaching and have

```
1    is the work order, not the estimate, correct?
2         A.    That's correct.
3         Q.    So, the estimate is a different document
4    and it's called estimate, this is the work order,
5    correct?
6         A.    It should mirror, it should mirror this
7    document but --
8         Q.    I understand, but they're two different
9    documents?
10        A.    They are two different documents, yes.
11        Q.    Are you 100 percent certain that you were
12   the technician that worked on 15007 and 16467?
13        A.    Pretty sure.
14        Q.    Pretty sure?
15        A.    Yes.
16        Q.    Are you 100 percent sure?
17        A.    Yeah.
18        Q.    Could Mr. Metcalf have worked on one of
19   these?
20        A.    I don't think so, no.
21        Q.    How do you come to understand certain
22   hours are credited to Mark Barnes on job number
23   15007?
24        A.    It's broken down into body labor and
```

1   were not paid properly because of your national

2   origin, sir.

3       A.   The other fact is Wayne Barnes at

4   lunchtime, he would get his paycheck and rub it in

5   everybody's face and be like, ha-ha, I work less

6   hours than you, and I got more than you, and we would

7   confront Mr. O'Connor about that. Mr. O'Connor would

8   -- I think he would say something to Wayne Barnes but

9   it never stopped.

10          MR. SIKORSKI:  Can you read the

11      question back?

12          (Requested portion of record

13          read back)

14      Q.   (By Mr. Sikorski)  Are there any other

15  facts that you have that support your contention that

16  you were not paid properly on the basis of your

17  national origin between 1999 and 2003 at Houser?

18      A.   Yes.

19      Q.   What other facts?

20      A.   Mr. O'Connor would make a statement that,

21  if you had done this job a little better, we would

22  have given you all the time, but since you didn't do

23  this, you're not getting paid all the time that you

24  deserve. And I did my job to the best, to the best

Case 3:04-cv-30111-KPN   Document 13-3   Filed 02/18/2005   Page 18 of 18
107

```
1    of my ability.
2         Q.    Can you give me one specific instance
3    where Mr. O'Connor said that to you --
4         A.    No, I cannot.
5         Q.    -- and it was not justified?
6         A.    No, I cannot.
7         Q.    Can you give a particular time, date?
8         A.    No, I cannot.
9         Q.    Are there any other facts that you have
10   that you haven't told us about today that support
11   your contention that you were not paid properly at
12   Houser Buick because of your national origin?
13        A.    I do not have anything else.
14        Q.    Towards the end of all depositions, sir,
15   I like to give the deponent a chance to correct any
16   answer or add anything make a statement if you would
17   like, and I'm going to give you that opportunity.
18   Sir?
19        A.    I did do most of the suspension work
20   there.  Nobody else would touch it.  Eighty to
21   ninety percent of the suspension work, mechanical, I
22   did it.  Ninety percent of the air bag installations,
23   modules, everything, I did all of that.  There was
24   nobody else in there, I thought, was qualified do the
```

Accurate Court Reporting * 1500 Main Street
Springfield, MA  01115
413-747-1806