Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO.: 04-30111-KPN

| | |
|---|---|
| JOSE QUINONES, <br>     Plaintiff | ) <br> ) <br> ) |
| vs. | ) <br> ) |
| HOUSER BUICK, <br>     Defendant | ) <br> ) |

### AFFIDAVIT OF KEVIN O'CONNOR

I, Kevin O'Connor, first being duly sworn, hereby depose and say as follows:

1. I am an adult resident of Palmer, Massachusetts, and understand the obligations of an oath.

2. I have been the manager of the Houser Collision Repair Center for the past nineteen years. The Collision Repair Center is an affiliate of the Houser Buick Corporation. It repairs and services vehicles sold and serviced by various Houser automotive franchises - the Buick; General Motors; Hyundai and Mitsubishi dealerships. In addition, about 10 to 15 percent of work is through private insurance companies.

3. The collision repair business is highly competitive. For the last 10 years large insurance companies have put increasing cost pressure on all auto body shops. The labor rates that we are allowed to charge are in the range of $32.00 to $34.00 an hour versus the $70.00 an hour or so that the automobile dealerships can charge for service and repair technicians. There has been no substantial increase in the hourly service rate in the auto body business in the last ten years. Thus, it is necessary to run a very tight ship in order to make any profit at all.

333132

4. The physical layout of the Houser Collision Center puts a premium on the ability of co-workers to get along and work together as part of a team. The space is fairly limited and persons work close by one another. Furthermore, different persons have to assist others in the process of providing our service. For example, the painter's assistant must do a good job preparing the vehicle for painting in order for the painter to perform his job in a cost effective manner.

5. Some of our technicians and painters are paid on what is known as a "flat rate." That is, they are not paid on an hourly basis, but rather on the basis of a flat rate for completing a particular job. Thus, if a particular repair or painting job has been budgeted at five hours, the technician or painter will receive pay for that amount. If the technician or painter can do the job in less time than that, they can make a premium wage.

6. It is hard to be a flat rate technician or painter. One must be very organized in order to be successful working on the flat rate. In other words, you have to be "two steps ahead of yourself" in planning your work day. However, I expect everyone in the Collision Center to work as part of a team.

7. I have known Jose Quinones for at least 13 years. I have hired him three separate times at the Houser Collision Center. In February of 1990, I hired Jose Quinones as a painter. He worked until August 2, 1991 when I terminated him for being late. He was a young man at the time and had significant problems with absenteeism.

8. About two years later, in September, 1993, I rehired Mr. Quinones as a painter. He worked at the Houser Collision Center until Christmas time 1995, when he, and several others were laid off. Houser Collision Center laid off Mr. Quinones because a large project was ending. That was the paint delamination project. That is, a large number of Buick and other GM

333132

cars had problems with their paint peeling during this period of time and we had to great deal of work to fix these problems. When the work dried up, Houser Collision had to layoff several people including Mr. Quinones.

9. I hired Mr. Quinones again for a third time on or about March 25, 1999. I did not terminate him. Mr. Quinones gave me a week's notice and quit his job.

10. I have considered myself to be friendly with Mr. Quinones over the years. In fact, in February, 2003, Mr. Quinones, his 10 year old daughter and myself went down to an automobile show in Hartford, Connecticut. Last year, I paid for Mr. Quinones' tickets to the Winston Cup races in Louden, New Hampshire. We both attended and had a good time. I have been over to his house on social occasions and met his wife. I have received feedback from several customers and other employees that Mr. Quinones enjoyed working for Houser. I had hired Mr. Quinones' nephew, Nelson Rodriquez. I gave Mr. Quinones keys to the body shop because I trusted him and we had a good working relationship.

11. I have reviewed Mr. Quinones' Charge of Discrimination that he filed with the Massachusetts Commission Against Discrimination, a copy of which I attach hereto as Exhibit A, and note, first of all, that he did not refer to the fact that he worked for the Houser Collision Center on three different occasions. Regarding his Charge in Paragraph 1, that white employees were allowed to do "side jobs," and he and other Hispanic employees were not allowed to do so, this allegation is not true. I let Mr. Quinones work on small side jobs on his personal vehicles and the personal vehicles of his friends and relatives. No one else was allowed to do this.

12. In Paragraph 2 of Mr. Quinones' Charge of Discrimination, Mr. Quinones again states that white employees were not fired for absences and tardiness, while Hispanic employees were fired for these reasons. Mr. Quinones does not know the facts and circumstances

333132

surrounding the way Houser Collision Center treats other employees. There have been no firings of Hispanic employees for absences and tardiness in the last five years, although one white male employee was terminated on May 7, 2002 for absenteeism. Mr. Quinones may be referring to a time 12 years ago when he was terminated for absences and tardiness. That was at the end of his first time working for Houser Collision Center.

13. Mr. Quinones was first working as an hourly employee and then was put on flat rate. As a flat rate worker, he had the opportunity to make much more money. However, as I stated above, to be a successful flat rate worker one has to be very organized. While Mr. Quinones was a hard worker, he was not organized enough to maximize his earning potential as a flat rate employee. On the other hand, Wayne Barnes was one of the most outstanding body shop employees in this area. He was quite fast, well organized and understood how to read a work order.

14. We did hire an older white male named Bill Metcalf who had decades of experience. Mr. Metcalf had run the Collision Center at Orr Cadillac, Curry Honda, and other local dealerships. This experience enabled him to command a higher rate of pay.

15. I deny that I called Mr. Quinones racial epithets, screamed at him or talked in a derogatory manner about his wife and kids. As I stated above, I have met his wife and children. I allowed Mr. Quinones to bring his teenage son to work on Saturdays. He did tell me that "all you Irish are alcoholics" or words to that affect.

16. Regarding the allegation that I told him "you are a white man in a Puerto Rican body," I may have said this to him in jest. Mr. Quinones told me that was what his co-workers at a company called Classic Refinishers said to him.

333132

17.     Regarding his leaving Houser Collision Center, I recall that on a Monday morning, Mr. Quinones came in and told me that he could no longer work for me because of "how things are run." I accepted his resignation and we agreed that he would work out the week. On Friday afternoon, he told me words to the effect of "you're going to hate this Puerto Rican. I am going to get you fired. I will be your worst nightmare." As I understand it, Mr. Quinones then filed the Charge of Discrimination within several weeks of making that remark.

18.     I attended the deposition of Mr. Quinones taken in this Federal Court case on October 4, 2004. Even at the deposition, Mr. Quinones indicated that he did not understand how time was allocated on work sheets. Mr. Quinones testified that certain repair time that was allocated to painter's work under our billing system should have been allocated to him. His deposition testimony reflected a long-time frustration that I had with Mr. Quinones. He simply did not know how to read work orders properly. He was too often concerned with how much painters and others were getting paid than with understanding our own paperwork system. I did sit down with him, as indicated in his deposition, every single week to go over what he had done that week and what he was going to be paid. I made him, and others in the body shop, keep a detailed diary to which would be attached work orders and time sheets. I did not hide from him any documents that would enable him to understand how much he was getting paid; rather I made sure he had the paperwork in front of him that would enable him to understand how he should be paid.

19.     Mr. Wayne Barnes and Mr. Quinones did have a loud confrontation between the two of them on the shop floor. Their fingers were in each other's faces. I came out and defused the situation. Mr. Quinones wanted to write up a statement about the situation. He came in and did so, but he later tore up the memo. The dispute did not concern race.

333132

02/18/2005 15:29    4137812923                 HOUSER AUTOCOLLISION                PAGE 01
02/18/2005   Case 3:04-cv-30114-KPN   Document 13-4   Filed 02/18/2005   Page 6 of 6 ☒007
ROBINSON DONOVAN

Page 6 of 6

20.  Philip Houser is the dealer principal of Houser Buick. He is an approachable boss who distributes paychecks every week at the Collision Center. Employees know that they can go to Mr. Houser with complaints.

21.  I have also reviewed Mr. Quinones' Answers to Interrogatories in this case. In his Answers, Mr. Quinones attempts to calculate the amount of money he allegedly was underpaid. In order to do that, he would have to compare the estimates and the work orders. Mr. Quinones testified only on the basis of work orders. He simply cannot make any claim for not being paid properly without having both sets of documents in front of him.

22.  I did not tell a customer that they had better watch out for the car because there was a Puerto Rican out back working. There are certain regulations in our body shop about individuals walking back into the working areas that discourage people from doing so.

23.  I heard Mr. Quinones testify in his deposition that Mark Barnes, Wayne Barnes' brother, was highly incompetent as a painter. Mark Barnes is a painter who has worked at Houser Buick for eight years. He is extremely skilled. In fact, because Mark Barnes is such a good painter, Mr. O'Connor interviewed Wayne Barnes, Mark Barnes' younger brother, and hired him. Numerous insurance appraisers in the area have told me that Wayne Barnes is "the best" in the area. I do note that Wayne Barnes was "a little cocky" and he would kid Mr. Quinones sometimes. Wayne Barnes also in my view spoke to other employees too often about how much he was making and this may have caused some resentment on the part of Mr. Quinones and others. This did not have anything to do with race.

Sworn to under the pains and penalties of perjury this 18th day of February, 2005.

_____
Kevin O'Connor

333152