UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO.: 04-30111-KPN

| | |
|---|---|
| JOSE QUINONES, ] | |
| ] | |
| Plaintiff, ] | |
| ] | |
| vs. ] | PLAINTIFF'S OPPOSITION TO |
| ] | DEFENDANT'S MOTION FOR |
| HOUSER BUICK, ] | SUMMARY JUDGMENT |
| ] | |
| Defendant. ] | |

Now comes the Plaintiff and opposes the Defendant's Motion for Summary Judgment.

The Defendant ran a body shop and a business wherein employees who knew how to negotiate and/or were aware of their potential benefit to the Defendant were able to get more advantageous working arrangements then other employees. See Exhibit "1" Deposition of Jeremy Laduc, page thirteen (dealing with issue of seniority from former employer purchased by Defendant Houser).

In addition, management was able to instruct employees to assist other employees. See Exhibit "2", Deposition of the Plaintiff Jose Quinones, pages twenty-nine and thirty (indicating that Plaintiff had assisted Billy Metcalf to do auto body work pursuant to management requests).

The Plaintiff was the sole higher earning position Hispanic employee at the time he worked at Houser Buick. See Exhibit "3" Deposition of Terry Mille, pages ten through twelve indicating that office workers and skilled positions in the body shop, body technicians and painters are all white with the exception of Mr. Quinones, the Plaintiff.

The only Spanish employee who had an employment position which would have allowed him to earn high income was Mr. Quinones. See Exhibit "4", Mr. Quinones at his Deposition, page ninety-nine.

It is clear from the Depositions taken of the Plaintiff, the witnesses, that the Plaintiff has made a case for damages indicating that he, the only Hispanic employee who was at a higher level job was paid at a different rate than the same position held by a Caucasian person.

Steven R. Weiner, Esquire
Attorney at Law
Springfield, MA

WHEREFORE, Plaintiff requests this Honorable Court deny the Motion for Summary Judgment.

The Plaintiff,
Jose Quinones,
By His Attorney,

Dated: 3 - 4 - 05

Steven R. Weiner, Esquire
BBO# 520090
930 Main Street
Springfield, MA  01103
(413) 781-1154

# EXHIBIT "1"

1    Regency, they picked and choosed.  There was a core

2    of about six or seven of their employees that they

3    wanted to keep.  They -- we knew what we were doing,

4    they knew we knew what we were doing, and they

5    offered all of us jobs to come down to Springfield.

6    Of the six or seven of us that came, um, I think

7    three of us kept our seniority.  Everybody else

8    didn't negotiate it, didn't even bring it up, so the

9    Housers didn't even present it to them, as far as I

10   can tell.  You know, I'm not speaking for anybody

11   else, but that's what I can tell.  And then we've

12   since, I think there's only two that have, that are

13   still there of the core, original core, that came

14   down.

15       Q.   Were any of the other people who went over

16   from Regency Houser to Houser here in East Columbus

17   Avenue in Springfield in the auto body shop?

18       A.    Not originally.  Um, Terry Maille came --

19   I started there in, well, late December, early

20   January, and she came in late April, early May --

21       Q.   Okay.

22       A.    -- as a kind of a helper in the body shop

23   just answering phones and kind of running customers

24   and doing miscellaneous errands.

# EXHIBIT "2"

1    jobs on Saturdays?

2         A.      Once or twice.

3         Q.      When you had your son down there, what

4    were you doing?

5         A.      Probably working on my own car.

6         Q.      That's different from a side job?

7         A.      Yes.

8         Q.      Did Mr. O'Connor let you work on your car

9    using Houser Buick tools?

10        A.      I used my own tools.

11        Q.      You used your own tools but you used the

12   facility there on Saturdays?

13        A.      Yes, I did.

14        Q.      While you were at Houser Buick, you would

15   help other people out often, wouldn't you?

16        A.      On the job, yes.

17        Q.      Yes, you helped Billy Metcalf out a lot,

18   right?

19        A.      Not just him.

20        Q.      But you did help Billy Metcalf out,

21   right?

22        A.      Yes, I did.

23        Q.      Did you ever think Billy Metcalf took

24   advantage of you?

1          A.     Not really.  It was by management

2     request.

3          Q.     When you were hired the last time at

4     Houser Buick, what was your rate of pay, do you

5     remember?

6          A.     When I got hired?

7          Q.     Yes.

8          A.     I believe it was eleven or twelve bucks

9     an hour.

10              MR. SIKORSKI:  Let's have this

11         marked as Exhibit 1.

12                   (Exhibit 1, marked)

13         Q.     (By Mr. Sikorski)  Do you see Exhibit 1,

14    Mr. Quinones?

15         A.     What's that?

16         Q.     Have you ever seen Exhibit 1 before

17    today?

18         A.     Yes, I have.

19         Q.     I'm going to represent to you that this

20    is a part of your personnel file.  Do you agree with

21    that?

22         A.     Yes.

23         Q.     It says that you started on March 25,

24    1999, as a painter at $12 an hour?

# EXHIBIT "3"

1    They usually send them in the fax machine to us, or

2    they give them to the customers, and THE customers

3    bring them in when they bring their jobs in to have

4    done.

5        Q.   Is it your job to review the appraisals

6    themselves?

7        A.   No.

8        Q.   Okay.  Does that job function get

9    performed by Mr. O'Connor?

10       A.   I would think so, yes.

11       Q.   Okay.  Would he have the expertise to

12   review an appraisal?

13       A.   Yes.

14       Q.   Does Mr. O'Connor actually do any of the

15   body work himself?

16       A.   If needed to, he'll help.

17       Q.   Who are the employees at Houser Collision

18   now, if you know?

19       A.   Um, none of them there -- they just all

20   have come.  They are just new.

21       Q.   Okay.  Who are they now?

22       A.   I don't know their last names.

23       Q.   That's okay.  First of all, how many of

24   them are there at the collision center?

```
 1          A.    One, two, three -- five, five of the guys,

 2    and then there's three of us in the office.

 3          Q.    Okay.  Who are the three people in the

 4    office?

 5          A.    Myself.

 6          Q.    Right.

 7          A.    Kevin O'Connor.

 8          Q.    Right.

 9          A.    And Gary Pedigo.

10          Q.    Okay.  What does Mr. Pedigo do?

11          A.    Supplements.

12          Q.    And the five people who work on the floor,

13    the five -- there are five people who work in the

14    shop?

15          A.    Um-hum.

16          Q.    Was that yes?

17          A.    Yes.  I'm sorry.

18          Q.    Thank you.  That's okay.  What are their

19    names, and if you only know the first names, that's

20    okay.

21          A.    There's Mark Barnes.

22          Q.    Okay.  Mark Barnes.  What does Mr. Barnes

23    do?

24          A.    Painter.
```

1          Q.   He's a painter?   Okay.   Who else is there?

2          A.   Andre.

3          Q.   What does Andre do?

4          A.   He's a body man.

5          Q.   Okay.   How long has Andre been there?

6          A.   I'm -- not quite a year.

7          Q.   Do you know his last name?

8          A.   I think it's Cauidex or something.

9     C-A-U-I-D-E-X.   I'm not sure.

10         Q.   Andre's appearance, is he Caucasian,

11    Hispanic, African American?

12         A.   He's white.

13         Q.   Okay.   And Mr. Barnes and Mr. Barnes,

14    Wayne and Mark, are they both Caucasian?

15         A.   Wayne doesn't work there.

16         Q.   Wayne doesn't work there?

17         A.   No.   Wayne Barnes does not work there.

18         Q.   Did he leave?

19         A.   A long time ago.

20         Q.   Okay.   Who else works there?   You've

21    mentioned --

22         A.   David.

23         Q.   -- Mark Barnes, a painter; Andre,

24         A.   Yep.

# EXHIBIT "4"

1    opposed to 25,000 or 20,000?

2         A.    Well, if Mr. Barnes wouldn't brag so much

3    about how much he made a year which was 69 to 70,000,

4    I did the same work, better experience using the

5    frame machine.  In fact, I had to help Wayne Barnes

6    set up his cars on the frame machine.  In reality, I

7    had more experience than he did, but since he's

8    American and I'm hispanic, somehow he got 69,000 a

9    year.

10        Q.    Because you contend you have more

11   experience than Mr. Wayne Barnes?

12        A.    Yes, I do.

13        Q.    And that your work is higher quality than

14   Mr.  Barnes?

15        A.    Yes, it is.

16        Q.    What is your current base rate, $17 an

17   hour?

18        A.    18, I'm getting right now.

19        Q.    When you started at your current job, how

20   much were you what was your base rate?

21        A.    15.

22        Q.    What was your W-2 income for 2003?

23        A.    I believe it was 40,000, little less,

24   little more.

## CERTIFICATE OF SERVICE

I, Steven R. Weiner, Esquire hereby certify that on this _____ day of March 2005 I caused a copy of the foregoing document to be served upon the parties in this action by mailing a copy of the same, postage prepaid, first class mail to John C. Sikorski, Esquire, ROBINSON, DONOVAN, P.C., 1500 Main Street, Suite 1600, Springfield, MA  01115.


_____
Steven R. Weiner, Esquire

**Steven R. Weiner, Esquire**
Attorney at Law
Springfield, MA